**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

FILED

2010 MAY 25   PM 4: 24

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

**UNITED STATES OF AMERICA**

-vs-                                                    **CAUSE NO.  A-10-CR-136-SS**

**PAUL EDWARD COPELAND**

_____

## ORDER

BE IT REMEMBERED on May 14, 2010, the Court held a hearing in the above-styled cause and the parties appeared in person and through counsel.  Before the Court were the Defendant Paul Copeland ("Copeland")'s Motion to Suppress Statements [#13], the Government's response thereto [#17]; Copeland's Motion to Suppress Physical Evidence [#14], the Government's response thereto [#18]; Copeland's Motion for Pretrial Notice of Other Crimes, Wrongs, or Acts [#15], to which no response was timely filed; Copeland's Unopposed Motion to Continue Trial Setting [#16]; Copeland's Motion to Withdraw Motion to Continue Trial Setting [#19]; and Copeland's Motion to Dismiss Indictment/Information [#20], and the Government's response thereto [#29].  As an initial matter, Copeland's Unopposed Motion to Continue Trial Setting [#16] is hereby GRANTED, as a continuance is necessary based on the multiple motions to suppress filed by Copeland.  Copeland's Motion to Withdraw Motion to Continue Trial Setting [#19] is accordingly DISMISSED as moot.  Thereafter, having considered the aforementioned motions and responses, the case file as a whole, the relevant law, and the arguments of counsel at the hearing, the Court enters the following.

## I.     Background

At the hearing, Special Agents Shawn Kang ("Kang") and Daniel Jones ("Jones") of the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") testified about the events leading up to the indictment of Copeland for disposing of a firearm to an illegal alien in violation of 18 U.S.C. § 922(d)(1)(A).  The following is taken from their undisputed testimony.

Agents Jones and Kang were conducting surveillance at the Texas Gun Show in Austin, Texas on January 16, 2010, along with members of the Austin Police Department, when they observed Copeland speaking in a "loud and boisterous" voice, stating he would sell firearms to whomever he wanted.  They understood Copeland to be referring to a rule that had recently been enacted by the promoter of the gun show, which directed that private sales by unlicensed dealers (such as Copeland) must be run through the books of a licensed firearm dealer so that the buyer would be subject to a background check.  Jones and Kang observed many of the private sellers "grumbling" about this rule on the day in question.

Some time during the day, the agents observed a group of four Hispanic males look at the guns at Copeland's table.  The group moved around to some of the other vendors, and then returned to Copeland's table.  The agents observed only one member of the group was speaking English, and that the men were avoiding the licensed gun dealers at the show.  These observations led the agents to believe the men might be illegal aliens.  When the group returned to Copeland's table, one of the men (who was later identified as Hipolito Aviles) initiated a conversation with Copeland.  Special Agent Kang was close enough to overhear the conversation.  Mr. Aviles showed an interest in a 9-mm "Star Echeverria" pistol, and tried to negotiate the price of the gun down from $450 to $400.  Copeland refused to sell at the lower price.  Mr. Aviles agreed to pay $450, and took the money out of his pocket to hand to Copeland.  Copeland asked for Mr. Aviles's identification, but Mr. Aviles could not or did

not want to produce identification.  Thus, another man in the group, Mr. Huerta, produced his own identification card, showed it to Copeland, and then took Mr. Aviles's money and gave it to Copeland in exchange for the pistol.

Observing the transaction, the agents believed Mr. Huerta was buying the gun on behalf of Mr. Aviles, as Mr. Huerta was not the one who had initially picked up the gun or negotiated for its price. When Copeland handed the gun to Mr. Huerta, he immediately handed it to Mr. Aviles.  Copeland objected that he had sold the gun to Mr. Huerta, and therefore Mr. Huerta should hold onto the gun. Mr. Aviles handed the gun back to Mr. Huerta.  But a minute or so after the group walked away from the table, Mr. Huerta handed the pistol back to Mr. Aviles.  The agents referred to this type of transaction as a "straw purchase," in which a prohibited person is able to obtain a gun by buying the gun through someone else.  The agents intercepted Mr. Huerta and Mr. Aviles outside the gun show, and were able to ascertain that the gun was indeed for Mr. Aviles, and Mr. Aviles was an illegal alien.

Agent Kang testified he thereafter returned to the gun show, informed Copeland he needed to speak with him, and asked him to step outside.  Copeland was carrying a concealed handgun at the time, and Copeland directed a friend who was standing nearby to remove the gun from its holster and keep it for him while he went outside.  Agent Kang testified he "[c]ommanded [Copeland] to leave the building," ordering him to walk straight out and not put his hands in his pockets.  Agent Kang testified Copeland was not free to refuse those orders.  It is undisputed that once Copeland was outside, the agents did not give him a *Miranda* warning, although they did inform him repeatedly that he was free to leave at any time.  Kang testified Copeland was surrounded by two to three ATF agents and/or agents of the Austin Police Department during the time he was outside.  The agents informed Copeland that Agent Kang had witnessed him selling a firearm to an illegal alien, and told him they "wanted his side of the story."  They told him if he did not cooperate his non-cooperation would be reported to the

United States attorney, who "would not like it." Copeland refused to say anything except that he had sold the gun to the person with the driver's license.

After interviewing Copeland, the special agents did not arrest him. However, they confiscated the other guns he had for sale, his personal firearm, and some ammunition.[1] Copeland was not arrested at the gun show, but he was indicted on March 2, 2010 for disposing of a firearm to an illegal alien in violation of 18 U.S.C. § 922(d)(1)(A), Indict. [#1], and was arrested on March 22, 2010.

## II.    Defendant's Motion to Suppress Statements [#13]

First, Copeland seeks to suppress all statements he made to the agents on January 16, 2010 on the grounds they failed to give him the required *Miranda* warnings prior to questioning him, and thereby violated his constitutional rights. Under the long-standing precedent of *Miranda v. Arizona*, 384 U.S. 436 (1966), a defendant's statements are generally not admissible if made before he is advised of his rights. *United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006). However, *Miranda* only applies to "custodial" interrogations. *Id.* A defendant who voluntarily gives a statement to law enforcement in a non-custodial situation need not be advised of his *Miranda* rights. *Id.* A suspect is "in custody" for purposes of *Miranda* "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* at 337 (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988)).

Both sides agree Copeland was not given any *Miranda* warnings prior to his conversation with the ATF agents on January 16, 2010, nor was he placed under formal arrest; thus, the essential issue

---

[1]Specifically, the following were seized: a Colt .45 caliber pistol, a Sig Sauer .380 caliber pistol, a Bersa .380 caliber pistol, a Kel-Tec 9mm caliber pistol, a Charter Arms .38 caliber pistol, a box of 100 rounds of Winchester 9mm ammunition, and assorted 9 rounds of .45 caliber ammunition.

is whether he was ever in "custody" on that date.  Whether a suspect is in custody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances. *Yarbrough v. Alvarado*, 541 U.S. 652, 663 (2004).  According to the Supreme Court, two discrete inquires are essential to the determination: "first, what were the circumstances surrounding the interrogation, and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 663.  "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).  Because courts take a case-by-case approach to resolve questions of custodial interrogation, a "particularized rendition of the facts" is required. *United States v. Akin*, 435 F.2d 1011, 1012 (5th Cir. 1970).

In the present case, it is undisputed the agents "commanded" Copeland to leave the building, and ordered him to walk straight out and not put his hands in his pockets.  Agent Kang testified Copeland was not free to refuse those orders.  Copeland was undisputedly surrounded by two or three armed agents while he was outside.  They told him they suspected him of a federal crime, and if he did not cooperate, his non-cooperation would be reported to the United States attorney, who "would not like it."  However, it is also undisputed Copeland was informed by the agents he was not under arrest. He was not placed in restraints or in any confined space, such as a police car, but instead remained in the parking lot of the gun show—a public place, where the conduct of the agents remained under public scrutiny.  It is undisputed the agents told him repeatedly he was free to leave.  Although Copeland had voluntarily removed his side arm before going outside, there is no evidence the agents

divested him of any other property, such as his cell phone, prior to his questioning. The interrogation was brief, and when it was over Copeland freely returned to the gun show.

Based on the foregoing, the Court finds a reasonable person in Copeland's position would not have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. Given the circumstances of the interrogation, a reasonable person would likely have felt he was at liberty to terminate the interrogation and leave, as he was specifically and repeatedly informed of this fact by the agents. The questioning was a "brief restraint," if any, and Copeland remained in an area not far removed from the gun show and wholly within the scrutiny of the public.[2] *See Bengivenga*, 845 F.2d at 598-99. Therefore, Copeland's motion to suppress his statements made during the interrogation in question is OVERRULED.[3]

## II.     Defendant's Motion to Suppress Physical Evidence [#14]

Copeland also claims the following evidence was seized unlawfully at the gun show on January 16, 2010 and thus should be suppressed: a Colt .45 caliber pistol, a Sig Sauer .380 caliber pistol, a Bersa .380 caliber pistol, a Kel-Tec 9mm caliber pistol, a Charter Arms .38 caliber pistol, a box of 100

---

[2]To make his case the statements should in fact be suppressed, Copeland relies on *United States v. Mendenhall*, in which the Supreme Court stated "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," 446 U.S. 544, 554-555 (1980), and on *United States v. Hanson*, 801 F.2d 757, 761 (5th Cir. 1986). Both cases are entirely inapplicable, as both consider the definition of a "seizure" under the Fourth Amendment. To conflate *Miranda*'s traditional "in custody" inquiry with the analysis used to determine whether the "seizure" of a criminal suspect is reasonable under the Fourth Amendment is a fundamental analytical mistake, as the two are wholly distinct inquiries. *See United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007); *United States v. Bagwell*, 5 F.3d 529, 1993 WL 373605 at *2 (5th Cir. 1993).

[3]The Court notes for the record it is difficult to determine any possible necessity for the motion to suppress Copeland's statements, as it is undisputed he gave no incriminating statement. Furthermore, the transaction in question was personally witnessed by ATF special agents who will no doubt testify as to their observations, and thus his statement has little, if any, relevance.

-6-

rounds of Winchester 9mm ammunition, and assorted 9 rounds of .45 caliber ammunition. The Government admits that after the agents questioned Copeland outside the gun show, they seized his remaining firearms, his personal side arm, and the ammunition in question because—according to the Government—probable cause existed to believe he was engaging in the business of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A). The Government claims the firearms and ammunition are relevant evidence which "go to his attitude, intent, motive, and state of mind with regard to the firearms and who he sold them to." Gov.'s Resp. at 2.

While the Fourth Amendment generally prohibits warrantless seizures, the "plain view" exception allows police to seize items where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was "immediately apparent;" and (4) the police had a lawful right of access to the item. *Horton v. California*, 496 U.S. 128, 136-37 (1990). In the present case, the Government claims the seizure of Copeland's weapons and ammo was lawful under the "plain view" exception because agents had witnessed a crime occurring in their view (the sale of a firearm to a prohibited person). The Government claims the evidence was seized to prevent further such breaches of the law and because the agents believed Copeland was selling firearms without a license. Thus, they seized his remaining firearms and ammunition, and his personal firearm (which was concealed in a holster in the small of his back, and was loaded, despite the fact he does not have a concealed handgun license). It is clear the agents in this case lawfully entered the area where the items were located, as the evidence was located in a public place (the gun show), and there is no dispute the items were in plain view. Thus, the only issues to be determined are (1) whether the incriminating nature of the items was readily apparent, and (2) whether the agents had a lawful right of access to the items.

The Government asserts the evidence in question was seized "(1) to prevent further breaches of the law by [Copeland] and (2) because they believed [Copeland] was dealing/selling firearms without a license." Govn't.'s Resp. at 3. However, it is undisputed Copeland is not being indicted for selling firearms without a license, and both special agents testified at the hearing it is perfectly lawful for private citizens to sell firearms without a license, provided they do not pass a certain threshold (such that they are considered in the business of "dealing" firearms). But there is no blanket requirement that a private gun seller must be federally licensed to sell guns. The agents did not testify they had any specific information on the date of the gun show which led them to believe Copeland might be engaged in the business of unlawfully dealing in firearms without a license. Therefore, based on the foregoing, there is simply no evidence supporting the Government's conclusory contention that the incriminating nature of Copeland's remaining firearms and ammo was "readily apparent." Accordingly, Copeland's motion to suppress physical evidence is GRANTED with respect to those of Copeland's guns and ammunition being held out for sale at the time of the seizure.[4]

However, this holding does not apply to Copeland's personal pistol, which he was undisputedly carrying without a concealed handgun license. The pistol was undisputedly in the agents' plain view, as Copeland voluntarily directed a friend to remove it from its holster in their presence. Because Copeland did not have a concealed handgun license, the incriminating nature of the handgun was readily apparent, and thus the plain view exception applies. Thus, the motion to suppress evidence is OVERRULED with respect to Copeland's personal handgun.

_____

[4]Once again, the Court notes the issues raised by the motion appear to be solely academic, as the Government states it does "not intend to introduce the firearms seized from the Defendant's display case or from his person during the trial." Govn't.'s Resp. at 2.

Furthermore, it should be noted the foregoing ruling has absolutely no impact on the testimony of any witness as to what he or she observed at the gun show—it pertains only to the physical evidence actually recovered by the agents, and not to any witness's personal observations.

### III.   Defendant's Motion for Pretrial Notice of Other Crimes, Wrongs, or Acts [#15]

Copeland seeks disclosure of any other crimes, wrongs, or other acts prior to trial pursuant to Federal Rule of Evidence 404(b). The motion is GRANTED, and the Government is hereby instructed to provide Copeland with such notice.

### IV.   Defendant's Motion to Dismiss Indictment/Information [#20]

Finally, Copeland requests dismissal of the indictment on the grounds the grand jury was subjected at length to testimony regarding the sale of firearms by unlicensed individuals in violation of federal law. Copeland claims the implication of the testimony was that Copeland is an unlicensed gun dealer, when in fact that conduct is not alleged in the indictment. He claims he was prejudiced by this implication.

The Government admits Agent Jones testified generally at the grand jury proceedings about gun shows and the types of violations which occur on a regular basis at gun shows, but asserts the Government's attorney made it very clear, in response to a question by a juror, that the Government was not pursuing charges against Copeland for being an unlicensed gun dealer. The Government argues Agent Jones's testimony, even if improper, did not render the proceedings fundamentally unfair. Govn't.'s Resp. at 3.

A transcript of the grand jury proceedings was not filed with the motion to dismiss, but was provided to the Court at the hearing on the motion. The transcript shows Agent Jones testified briefly, at the commencement of his testimony, about why he and Agent Kang were working undercover at the Texas Gun Show, stating one of the "major problems" with the gun show was the fact the show was allowing private sales,

> ...[and] these private sellers of firearms were a major source of guns to illegal aliens and convicted felons. We had proved this by doing numerous cases in 2009 where we arrested and convicted several subjects obtaining firearms from the gun show, from

-9-

either private sellers or people that had set up their tables, that were professing that
they were selling their personal collection.

Grand Jury Tr. at 3-4. The Government's attorney interrupted Agent Jones to state "It's not, under any
circumstances, illegal for a private citizen to sell a firearm that they own to someone else." *Id.* at 5.
Agent Jones agreed, but stated there are "limitations"—"if you were a person that continually bought
and resold guns, what we call flipping them, and your purpose and intent was for livelihood and profit,
not for just trying to get rid of a collection or sell a gun periodically, then you could be engaging in the
business of dealing firearms without a license." *Id.*

Agent Jones went on to recount the events of January 16, 2010, in testimony almost identical
to that he offered at the hearing. When he had finished, one of the grand jurors asked "Are there a lot
of vendors that are not licensed to sell up at these gun shows?" Agent Jones answered, "Yes, there
are... And that's what makes it a very good, easy place for convicted felons or illegal aliens or other
people that are prohibited to go into the show and obtain a gun." *Id.* at 20. Another grand juror later
clarified, referring to Copeland, "But he really shouldn't have been selling them in the first place,
right[?]—since he didn't have a license." *Id.* at 22. Both Agent Jones and the Government's attorney
responded, "Correct." *Id.* When the grand juror continued to pursue this line of questioning—asking
"He just can't sell them without a license?"—the Government's attorney responded:

> That's another can of worms that's not on the presentation. That is also a possibility,
> but that wasn't in this investigation, at this time.

*Id.* at ¶ 23.

Based on the foregoing, Copeland argues "it is apparent the grand jurors were subjected at
length to testimony regarding the sale of firearms by unlicensed individuals in violation of federal law
at Austin area gun shows, which result in sales of firearms to felons and illegal aliens." Def.'s Mot.
Dismiss. Copeland claims Agent Jones's testimony linked him with these activities, and implied he

was an unlicensed gun dealer in violation of federal law, "and as such was engaged in criminal conduct not alleged in the indictment, for which he was not being investigated." *Id.* Copeland claims he is prejudiced by this implication. *Id.*

The Supreme Court has held "a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant[]." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). "The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. Mechanik*, 475 U.S. 66, 75 (1986). In order to merit dismissal of the indictment, either (1) the errors must compromise "the structural protections of the grand jury [so] as to render the proceedings fundamentally unfair, allowing the presumption of prejudice," or (2) it must be shown the errors prejudiced the defendant—in other words, that the errors either "substantially influenced" the grand jury's decision to indict or there is "grave doubt" the decision to indict was free from the substantial influence of such violations. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256-57 (1988) (citing *Mechanik*, 475 U.S. at 78 (O'Conner, J., concurring)).

In the present case, the grand jury was presented with almost overwhelming evidence in support of the Government's allegations against Copeland. Agent Jones is a credible witness whose description of Copeland's conduct was detailed and precise, and was based on personal observations by him and Agent Kang. Furthermore, Agent Jones's general testimony about the problems with unlicensed dealers—which Copeland here challenges—was expressly qualified by the Government attorney's specific statement to the grand jury that Copeland was not being investigated for unlicensed dealing. Thus, the Court finds the testimony in question, even if it was erroneous, could not have "substantially influenced" the grand jury's decision to indict Copeland, and therefore did not prejudice Copeland. Accordingly, Copeland's motion to dismiss the indictment is OVERRULED in full.

-11-

## V.    Conclusion

In accordance with the foregoing,

IT IS ORDERED that Defendant Paul Copeland's Motion to Suppress Statements [#13] is OVERRULED.

IT IS FURTHER ORDERED that Defendant Paul Copeland's Motion to Suppress Physical Evidence [#14] is GRANTED in part and OVERRULED in part, as indicated in the foregoing order.

IT IS FURTHER ORDERED that Defendant Paul Copeland's Motion for Pretrial Notice of Other Crimes, Wrongs, or Acts [#15] is GRANTED.

IT IS FURTHER ORDERED that Defendant Paul Copeland's Unopposed Motion to Continue Trial Setting [#16]is GRANTED, and thus Copeland's Motion to Withdraw Motion to Continue Trial Setting [#19] is DISMISSED as moot.

IT IS FINALLY ORDERED that Defendant Paul Copeland's Motion to Dismiss Indictment/Information [#20] is OVERRULED.

SIGNED this the 25 day of _____may_____ 2010.

_____
UNITED STATES DISTRICT JUDGE